Filed 12/23/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B318582 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA103608) |
| v. | |
| THOMAS WHITMILL, | |
| Defendant and Appellant. | |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County.  Amy N. Carter, Judge.  Reversed and remanded with instructions.

　　　　Karyn H. Bucur, by appointment of the Court of Appeal, for Defendant and Appellant.

　　　　Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

# INTRODUCTION

Sixty-one-year-old defendant and appellant Thomas Whitmill appeals the denial of his pretrial motion for mental health diversion of his criminal prosecution. He argues he is an honorably discharged veteran who suffers from a severe mental disorder and meets the eligibility requirements for pretrial mental health diversion under Penal Code[1] section 1001.36.

We conclude the trial court erred when it denied appellant's motion. We reverse and remand the matter to the trial court with instructions to grant the motion for diversion.

# FACTUAL AND PROCEDURAL BACKGROUND

## I.     Underlying Facts[2]

During the evening of March 26, 2021, appellant and Shannon Carter, his girlfriend of two years with whom he shares an apartment in West Covina, drove to the City of Gardena to visit a friend of hers. Appellant "wasn't feeling too good" so, after dropping Shannon off at her friend's, he went to the grocery store to get "some medication." He dropped Shannon off in an alleyway with parking stalls and carports near an apartment building.

He later returned, "with his medication," to pick Shannon up. He asked her if she wanted to stay with her friend, but she said no and got into his van. Appellant began "to get loud because at that present moment he wasn't feeling too good." Shannon exited the van and walked back towards her friend Dez,

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Information about the incident is taken from the transcript of the preliminary hearing.

2

who was in his car.  She got in Dez's car and went to the store with him to buy cigarettes.

Shannon and Dez returned to the alley where appellant had previously dropped her off.  Dez exited his car and walked towards appellant; he asked appellant if he was "okay" because "it looked like he was—something was wrong."  Appellant replied, "Don't walk up on me" and fired a shot in the air.  Shannon did not see who fired the shot, as she was in the process of exiting Dez's car and had her back towards them.  Shannon looked towards appellant's direction and observed he was "enraged."  At the time of the gunshot, Shannon was about 15 feet away from appellant, and Dez was about three and a-half to four feet away from appellant.  Appellant then walked towards Shannon and pointed his left index finger towards her; she did not see a gun in appellant's hands.  She asked him if he was okay because she had "never seen him . . . acting" like this, "moving at a fast speed and . . . just upset."  Appellant then ran away.

Almost immediately, Shannon flagged down a Los Angeles County Sheriff's car that was coming in her direction.  She pointed at appellant and told Deputy Sheriff Kevin Walker that he "had a gun and that [she] heard a shot go off."  Deputy Walker looked towards appellant's direction and "saw him cut northbound into a carport where he appeared to toss something under a car."  Deputy Walker ordered appellant to show his hands and exit the carport.  Appellant complied with "no incident," and was detained by Deputy Walker.

Deputy Sheriff Gustavo Rosales arrived at the scene and canvassed the carport area for a firearm and expended shell casings.  He recovered a 9-millimeter handgun on the bed of a

3

black Silverado truck; the firearm was loaded.  He also found one extended 9-millimeter shell casing in the dirt in the alley.

According to Deputy Walker, Shannon told him she saw appellant "holding a firearm in his hand" after having heard the shot, and that appellant said to her, "Bitch, I will kill you." Shannon testified she did not recall telling Deputy Walker she saw appellant with a gun in his hand.  She also testified that appellant did not threaten her.  According to Shannon, a man named Loco walked up to her after the incident and said, "Bitch, is he going to kill you?"  She did not recall from which direction Loco arrived; "everything just happened so fast" and she was "in shock."

Shannon later discovered there were people standing about 35 to 40 feet away from the scene of the incident, "inside of a gate" in "the next apartment over from the alley."  They were not visible from where she was standing during the incident, but she later saw them when "one of the officers told them to close the gate."

Shannon continued to remain in contact with appellant after the incident and is still in a dating relationship with him.

## II.    The Charges and Plea

On June 10, 2021, appellant was charged by amended information with one count of possession of a firearm by a felon (§ 29800, subd. (a)(1)), one count of discharge of firearm with gross negligence (§ 246.3, subd. (a)), and one count of criminal threats (§ 422, subd. (a)).

On July 15, 2021, appellant entered a plea of not guilty. He also informed the court he "seeks mental health diversion."

4

III.    <u>Motion for Mental Health Diversion</u>

On October 29, 2021, appellant filed a notice of motion for pretrial diversion pursuant to section 1001.36.  In support of his motion, appellant submitted a sworn declaration from his counsel, a confidential psychological evaluation report by Robin Rhodes Campbell, Ph.D., MPH, MS (Dr. Campbell), and a letter from appellant's Veteran's Administration (VA) liaison Jonathan Clark, LCSW.

The psychological evaluation report states appellant was evaluated on October 14, 2021 by Dr. Campbell as to his eligibility for diversion under section 1001.36.  Dr. Campbell reviewed Los Angeles Sheriff's Department records, the CLETS report, probation officer's report, case records, records from the VA, and the letter from appellant's VA liaison.

VA records indicate appellant was treated for military sexual trauma (MST) and was diagnosed with post-traumatic stress disorder (PTSD).  He was treated for intrusion symptoms and negative alterations in mood and cognition and received psychiatric and psychological treatment.  Appellant attributes his PTSD to the sexual violence he experienced.  He has had "recurrent, involuntary, and intrusive distressing memories of the traumatic event."  He experiences flashbacks, "distressing dreams," and "dissociative reactions related to the event."  Appellant's "beliefs about the world were changed by the trauma, as he found it difficult to trust people afterward."  He "sometimes . . . mistake[s] people's intentions toward [him]" and catches himself "in a daze" and tries not to "let [him]self react to those thoughts."

He reported an ongoing pattern of using substances "as a way of dealing with the MST" and his psychiatric symptoms.  He

5

had substance abuse treatment at the VA in the past, and "found it to be helpful." He was previously in treatment for over two years, but relapsed in November 2020 upon learning a loved one was diagnosed with cancer; a few months later, he was arrested following the March 2021 incident. He reported he was "very willing" to participate in substance abuse treatment as well as mental health treatment.

Dr. Campbell opined appellant has "severe mental illness" further complicated by substance abuse. Appellant's mental disorder "was considered to be a significant factor in the charged offense and would be amenable to treatment." His symptoms include "hypervigilance, irritability, depression, affective numbing, and an increased perception of threat." Prior to the incident, appellant was "using substances to numb his painful negative emotions" and at the time of the incident, experienced "a heightened sense of threat and reacted accordingly." Dr. Campbell opined that due to "interference from [appellant's] severe mental disorder, [he] was not able to perceive events accurately or respond appropriately to them."

Dr. Campbell opined appellant "would not pose an unreasonable risk of danger to public safety if treated in the community and he abstains from substance abuse." Dr. Campbell further opined that "any risk to the community could be mitigated by treatment." Appellant had benefitted from treatment in the past. Appellant has now been taking medication and reports "a reduction in anxiety and depression." Dr. Campbell concluded appellant fit the eligibility criteria under section 1001.36. Dr. Campbell also provided a detailed treatment plan for appellant, including antidepressant medication, psychological therapy, substance abuse treatment, and intensive

inpatient mental health services. Dr. Campbell recommended a "dual-diagnosis treatment program that addressed both his psychiatric disorder and his substance abuse disorder" and believed he "would benefit from focused and appropriate intervention."

The VA liaison noted appellant received an honorable discharge and was diagnosed and rated as 90 percent service-connected for PTSD. He suffered from PTSD, hypervigilance, high-startle response, deep depression, insomnia, sleep disturbance, self-isolation, and anxiety. He was rated as being unemployable. The VA requested "the court consider allowing this Veteran an opportunity to take advantage of the Military Misdemeanor [and] Felony Diversion Statute[s] . . . and Mental Health Diversion statute." The VA "would be happy to work with [appellant] and the court to facilitate an appropriate treatment plan to meet the court's and the Veteran's requirements."

IV.    The People's Opposition

On December 27, 2021, the People filed opposition to the motion for mental health diversion. They argued the defense failed to provide any evidence that appellant will not pose an unreasonable risk of danger to public safety. They argued appellant "demonstrated that he is violent and likely to commit a super strike, namely attempted murder or murder." Appellant's history "suggests that he will likely continue to use narcotics." They stated appellant is a "threat to public safety" and "cannot be safely treated in the community."

The prosecution listed appellant's criminal record, which included possession and sale of drugs and theft. The prosecution conceded as well that appellant's "criminal record does not include crimes of violence."

## V.     Hearing and Ruling

On February 10, 2022, the court denied appellant's motion. The court compared the facts of appellant's case with *People v. Moine* (2021) 62 Cal.App.5th 440 (*Moine*). The court found that although there were threats made by the defendant in *Moine*, "the circumstances in that case were vastly different from what I'm looking at in the current case." The court also found it "significant" that the defendant in *Moine* was found by the experts to pose "a low risk for future assault" whereas the expert in this case found appellant would not pose an unreasonable risk of danger to public safety if treated so long as he abstained from substance use. "This expert opinion is very different. It is very qualified. It is not an assessment that there's low risk of future assault as there was in *Moine*. Instead . . . [t]he assessment [here] is not a low risk and it requires that the defendant abstain from substance use. [¶] . . . [¶] But the level of control that would be required of the defendant, I think it would be unreasonable for me to expect that he would be able to exercise that level of control over his behavior. [¶] Any grant of mental health diversion requires a commitment and behavior modification from a defendant, especially where substance abuse, rather substance abstention, abstaining from substances, is part of the expert's opinion. [¶] And what I have here is a defendant who had three years in the county jail suspended. And that's designed to create a strong disincentive to commit any new crime. That does not give me great confidence."

"[T]he critical factor that I'm relying on, is the gun use reflected in the preliminary hearing transcript in this case. [¶] What I have here is a criminal threat accompanied by firing a shot into the air. And according to the information in the . . .

8

preliminary hearing transcript, including the impeaching statements made by the named victim to the member of law enforcement on the night of the incident, the defendant made a threat to kill after he had fired a shot in the air. [¶] The distances described at the time the defendant fired the shot was 15 feet from the female victim.  And . . . that was three and a half feet to four feet, at the most, between the defendant and the male who was present at the time the shot was fired.  That is so very different from the situation in *Moine*. [¶] When I am looking at what is reasonable and what is unreasonable to subject innocent members of the community to, in terms of risk, when I release someone in the community to be treated, looking at making a death threat and firing a gun in the air . . . leads me to conclude that it would be irresponsible for me to, to find that that would be an acceptable risk of dangerousness."

The court found that "based on the defendant's willingness to make a threat to kill accompanied by firing a gun into the air, that that conduct demonstrates that he is likely to commit a super strike offense."  The court concluded that appellant "poses an unreasonable risk of danger to public safety as defined in . . . section 1170.18" and denied his motion.

On February 17, 2022, appellant and the prosecution entered into a plea agreement.  He withdrew his guilty plea and pleaded no contest to discharge of a firearm with gross negligence (§ 246.3, subd. (a)); the remaining two counts were dismissed upon the People's motion.  Appellant admitted to violating probation in case Nos. TA152209 and YA100085 due to his conviction in the instant case.  Appellant was sentenced to a total term of three years in prison for the two probation violations and

9

the instant case (violation of § 246.3, subd. (a)).  He received 656 days of credit.

Appellant timely appealed.  The trial court granted a certificate of probable cause to appeal the denial of the motion for mental health diversion.  (See *People v. Padfield* (1982) 136 Cal.App.3d 218, 228 [the wrongful denial of pretrial diversion may be raised on appeal by a certificate of probable cause after a plea of guilty or no contest].)

## DISCUSSION

### I.     Standard of Review

A trial court's ruling on a motion for mental health diversion is reviewed for an abuse of discretion, and factual findings are reviewed for substantial evidence.  (*Moine*, *supra*, 62 Cal.App.5th at p. 449; *People v. Oneal* (2021) 64 Cal.App.5th 582, 588.)  A trial court has "broad discretion to determine whether a given defendant is a good candidate for mental health diversion."  (*People v. Curry* (2021) 62 Cal.App.5th 314, 324.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citation], or bases its decision on express or implied factual findings that are not supported by substantial evidence."  (*Moine*, at p. 449; *People v. Bunas* (2022) 79 Cal.App.5th 840, 848–849 (*Bunas*).)

### II.    Applicable Law

Section 1001.36 authorizes pretrial mental health diversion for defendants with qualifying mental health disorders.  (*People v. Frahs* (2020) 9 Cal.5th 618, 626–627 (*Frahs*).)  As used in the statute, "pretrial diversion" means " 'postponement of prosecution, either temporarily or permanently, at any point in

10

the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment.' " (*Id*. at p. 626, citing § 1001.36, subd. (c).) "At any stage of the proceedings, the court may require the defendant to make a prima facie showing that the defendant will meet the minimum requirements of *eligibility for diversion* and that the defendant and the offense are *suitable for diversion*." (§ 1001.36, subd. (b)(3), italics added.)

The six threshold *eligibility* requirements are set forth in section 1001.36, subdivision (b)(1)(A)–(F). First, the court must find defendant suffers from a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders. (*Id.*, subd. (b)(1)(A).) "Evidence of the defendant's mental disorder shall be provided by the defense and shall include a recent diagnosis by a qualified mental health expert. In opining that a defendant suffers from a qualifying disorder, the qualified mental health expert may rely on an examination of the defendant, the defendant's medical records, arrest reports, or any other relevant evidence." (*Ibid*.)

Second, the court must find "the defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)(B).) "A court may conclude that a defendant's mental disorder was a significant factor in the commission of the charged offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the

11

offense, the court concludes that the defendant's mental disorder substantially contributed to the defendant's involvement in the commission of the offense." (*Ibid.*)

Third, "a qualified mental health expert" must opine that "the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(1)(C).)

Fourth, subject to certain exceptions, the defendant must consent to diversion and waive his or her right to a speedy trial. (§ 1001.36, subd. (b)(1)(D).)

Fifth, the defendant must agree to comply with treatment as a condition of diversion. (§ 1001.36, subd. (b)(1)(E).)

Finally, the court must find defendant will not pose an "unreasonable risk of danger to public safety . . . if treated in the community." (§ 1001.36, subd. (b)(1)(F).) Section 1170.18, subdivision (c) defines "unreasonable risk of danger to public safety" to mean "an unreasonable risk that the petitioner will commit a new violent felony" within the meaning of section 667, subdivision (e)(2)(C)(IV). That clause, in turn, itemizes eight categories of offenses—sexually violent offenses, oral copulation with a child under 14, lewd or lascivious act with a child under 14, homicide, solicitation to commit murder, assault with a machine gun on a peace officer, possession of a weapon of mass destruction, and any serious or violent felony punishable by life imprisonment or death—colloquially referred to as "super strikes." (§ 667, subd. (e)(2)(C)(iv); *Bunas, supra,* 79 Cal.App.5th at p. 851, fn. 11.)

Even if a defendant meets the six threshold eligibility requirements, "a trial court may still exercise its discretion to deny mental health diversion if it finds that the defendant or the

12

offense are not *suitable for diversion.*" (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 888, italics added (*Qualkinbush*).) In determining a defendant's suitability for mental health diversion, a trial court may not rely on general sentencing objectives set forth in rule 4.410 of the California Rules of Court[3] and must consider the primary purposes of the mental health diversion statute as set forth in section 1001.35. (*Id.* at pp. 890–892; *Bunas, supra,* 79 Cal.App.5th at pp. 865–866.)

The stated purpose of this legislation is to keep people with mental disorders from entering and reentering the criminal justice system while protecting public safety, to give counties discretion in developing and implementing diversion across a continuum of care settings, and to provide mental health rehabilitative services. (See *Qualkinbush, supra,* 79 Cal.App.5th at p. 886 [discussing § 1001.35].) The Legislature intended the mental health diversion program to apply as broadly as possible. (*Frahs, supra,* 9 Cal.5th at p. 632.) The court "must treat the matter as if the charges against the defendant have not yet been adjudicated; the court is not sentencing the defendant." (*Qualkinbush,* at p. 892, fn. 11.)

---

[3] The general objectives of sentencing include: protecting society, punishing the defendant, encouraging the defendant to lead a law-abiding life in the future and deterring him from future offenses, deterring others from criminal conduct by demonstrating its consequences, preventing the defendant from committing new crimes by isolating him for the period of incarceration, securing restitution for the victims of crime, achieving uniformity in sentencing, and increasing public safety by reducing recidivism through community-based corrections programs and evidence-based practices. (Cal. Rules of Court, rule 4.410(a).)

13

If the defendant successfully completes diversion, including having in place a plan for long-term mental health care, the criminal charges shall be dismissed. (§ 1001.36, subd. (e).) However, if after diversion is granted, a qualified mental health expert concludes the defendant "is performing unsatisfactorily in the assigned program," the court shall, after notice to defendant, hold a hearing to determine whether criminal proceedings should be reinstated or treatment modified. (*Id.*, subd. (d)(4)(A).)

III. <u>Analysis</u>

On appeal, only one of the six prongs in section 1001.36, subdivision (b)(1) is at issue, namely subdivision (b)(1)(F)—that the defendant "will not pose an unreasonable risk of danger to public safety . . . if treated in the community." (§ 1001.36, subd. (b)(1)(F).)

It is undisputed appellant satisfies the first five of the six qualifying mental health diversion requirements and the People do not contend otherwise. First, appellant was diagnosed and rated as 90 percent service-connected for PTSD, a qualifying mental disorder (per § 1001.36, subd. (b)(1)(A)), resulting from the MST he suffered. Second, Dr. Campbell opined appellant's mental disorder "played a significant role in the commission of the charged offense" and appellant was "not able to perceive events accurately or respond appropriately to them" due to "interference from his severe mental disorder." Third, Dr. Campbell further opined a dual-diagnosis treatment program that addressed both his psychiatric and substance abuse disorder would be most beneficial and appellant's symptoms would respond to treatment. Fourth and fifth, appellant expressed he was "very willing" and consented to the diversion and agreed to

14

comply with the treatment as a condition of diversion (per § 1001.36, subds. (b)(1)(D), (E)).

Appellant contends the trial court abused its discretion in denying his request for pretrial mental health diversion because there is no evidence, let alone substantial evidence, to support the court's finding that he poses an unreasonable risk of danger to public safety if treated for his mental illness in the community. He argues the record does not support the trial court's conclusion given appellant's lack of a prior history of violent felony convictions and his mental state at the time of the crimes. He claims the trial court further abused its discretion because the Legislature intended the mental health diversion program to apply as broadly as possible.

We agree there was no substantial evidence that appellant poses an unreasonable risk to public safety or, put another way, that he is too dangerous to be treated in the community because he would commit a new violent super strike. (§ 1001.36, subd. (b)(1)(F) and § 667, subd. (e)(2)(C)(iv).) Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14. (*People v. Jefferson* (2016) 1 Cal.App.5th 235, 242; § 667, subd. (e)(2)(C)(iv).)

Here, the trial court did not find that appellant is "likely to commit a super-strike offense." (*People v. Hoffman* (2015) 241 Cal.App.4th 1304, 1210; *Moine, supra*, 62 Cal.App.5th at p. 450 ["a trial court necessarily must find the defendant is 'likely to commit a super-strike offense' " to deny diversion on this

15

ground; in other words, "the risk of danger is narrowly confined to the likelihood the defendant will commit a limited subset of violent felonies"].)  Nor is there any evidence in the record to support such a finding.  It is undisputed appellant's prior record, consisting of possession and sales of drugs and theft, does not include violent or sexually violent convictions, let alone a super strike.  (*Hoffman* at p. 1310 [finding that the record did not support a finding of dangerousness under § 1170.18 where the defendant had no prior criminal history and her recent charges for 18 counts of felony forgery and one count of grand theft of property were not super-strike offenses].)  Moreover, it is significant that the facts of this incident include appellant running away from further confrontation, throwing away his firearm, and peacefully complying with law enforcement's request that he come forward and (presumably) be arrested.  This unusual scenario is a far cry from indicating that appellant is likely to commit a super strike offense in the future.

The trial court below compared the facts of appellant's case with *Moine* and found it significant that the defendant in *Moine* was found by the experts to pose "a low risk for future assault" whereas the expert "assessment [here] is not a low risk and it requires that the defendant abstain from substance use."  It then concluded, with no reference to supporting evidence, that "it would be unreasonable for [the court] to expect that [appellant] would be able to exercise that level of control over his behavior."

First, it is unclear how the court determined that the expert opinion here did not find a low risk for future dangerousness when Dr. Campbell expressly concluded that appellant fit the eligibility criteria under section 1001.36 and further determined he "*would not pose an unreasonable risk of*

16

*danger* to the public safety if treated in the community and abstains from substance abuse."

Second, we find no substantial evidence to support the finding that it would be "unreasonable" for the court "to expect that [appellant] would be able to exercise that level of control over his behavior," i.e., abstain from substance abuse such that he won't commit a super strike. The record before us includes substantial evidence that actually leads us to conclude otherwise. Appellant attributed his relapse in November 2020 to receiving news about a family member's cancer diagnosis. He found the substance abuse treatment he received at the VA in the past was "helpful" and that he was "very willing" to participate in substance abuse treatment as well as mental health treatment. In fact, Dr. Campbell's report noted that appellant's severe mental disorder "would be amenable to treatment" and that he "benefitted from treatment in the past." This indicates a high likelihood that appellant, if provided the chance to participate in a dual-diagnosis treatment program addressing both psychiatric and substance abuse issues, would benefit from mental health diversion and would learn to "be able to exercise that level of control over his behavior"—contrary to the trial court's finding otherwise. (See § 1001.36, subd. (h) [the court may consider past performance/participation and records related to a mental disorder].)

Appellant had reported to Dr. Campbell an ongoing pattern of using substances "as a way of dealing with the MST" and his severe mental disorder/PTSD. In appellant's case, the proposed mental health diversion plan included personalized dual treatment addressing both appellant's mental disorder and substance abuse disorder. The VA liaison officer had confirmed

the VA would "work with [appellant] and the court to facilitate an appropriate treatment plan to meet the court's and the Veteran's requirements." Taking into consideration that the Legislature intended mental health diversion to be applied as broadly as possible (*Frahs*, *supra*, 9 Cal.5th at p. 632), ordering appellant to participate in such a dual mental health diversion plan would provide an opportunity to address and treat appellant's MST, PTSD, as well as his substance abuse disorder. This goes hand in hand with the stated purpose of the mental health diversion statute as set forth in section 1001.35—to keep people with mental disorders from entering and reentering the criminal justice system while protecting public safety, to give counties discretion in developing and implementing diversion across a continuum of care settings, and to provide mental health rehabilitative services. (See *Qualkinbush*, *supra*, 79 Cal.App.5th at p. 886 [discussing § 1001.35].) That Dr. Campbell reported appellant has benefitted from treatment in the past and opined that any risk to the community by appellant could be mitigated by treatment suggests that appellant is the type of person for whom the Legislature designed the option of diversion.

After reciting the facts of the incident, the People make the generic claim that appellant demonstrated he is violent, poses an unreasonable risk of danger to the public, and likely to commit a super strike, namely attempted murder or murder. Respondent argues the trial court "was rightly concerned about the risk that appellant would commit homicide or attempted homicide if allowed to remain in the community." The problem with the People's argument is that they offer no specific substantial evidence to support their position. They refer to appellant's substance abuse but, as already stated, that abuse does not

18

constitute substantial evidence that appellant would commit a murder, attempted murder, or any other super strike. They also point out appellant was in possession of a firearm and "recklessly" fired a single shot into the air. Yet they agreed that appellant could plead no contest to negligent discharge of a firearm, presumably because that accurately describes what he did. And we agree that the plea to negligent discharge appropriately summarizes that happened, considering the unique circumstances surrounding appellant and the incident.

First, appellant mentioned before the incident that he "wasn't feeling too good" and went to get "some medication"; Shannon's testimony confirmed he was not feeling well that day; she had "never seen him . . . acting" like this, "moving at a fast speed and . . . just upset." Dez reported "it looked like he was—something was wrong."

Second, right after Dez came up to appellant to check on him, appellant stated "don't walk up on me" and fired a single shot up in the air. This appears to be evidence of the hypervigilance appellant suffered. Yet despite this symptom of his mental illness, he had the presence of mind to warn Dez not to approach him in that manner again.

Third, and perhaps most importantly, appellant shot a single shot up in the air, as if using it more like a bullhorn to warn Dez against approaching any closer. He did not aim the handgun at Dez or Shannon, but rather aimed at the sky. Surely he could have aimed the gun at Dez, who was three and a-half to four feet away, or Shannon, who was 15 feet away, if he intended to inflict injury on a person.

Nor did he turn around and engage, aim, or fire the gun at Deputy Walker who appeared on site within moments. Instead,

19

he threw the gun away and immediately turned himself in to Deputy Walker with "no incident." These undisputed facts indicate a likelihood that appellant would not commit a super strike. The court's speculation that appellant posed an *unreasonable* risk of danger to public safety is belied by the totality of appellant's behavior and criminal history.

The People refer to the fact that there was a crowd of people about 35 to 40 feet away from the scene. But, as evidenced by Shannon's testimony, that crowd was not visible from where they were standing during the incident as the crowd was "inside of a gate" in "the next apartment over from the alley." The crowd became apparent only when "one of the officers told them to close the gate."

The People also compare the facts in appellant's case to *Moine* and *People v. Pacheco* (2022) 75 Cal.App.5th 207 (*Pacheco*). As to *Moine*, the People fail to mention that the defendant in that case was also charged with two other felony counts for assault and battery and one misdemeanor count for battery, all stemming from a second, unrelated incident the year before. (*Moine*, *supra*, 62 Cal.App.5th at pp. 444–445.) The defendant had stated he had a gun and he had threatened to kill everyone. (*Id.* at p. 445 & fn. 2.) While it is true the defendant in *Moine* did not possess or threaten the use of a gun, the evidence did show he had a documented record of prior violence. In our case, appellant has no prior record of violence and his actions on the night in question were consistent with the symptoms caused by his PTSD. His compliant non-violent behavior after negligently firing one shot into the air mitigates any inference that appellant is likely to commit a super strike offense in the future. (See *id.* at p. 451.)

20

In *Pacheco*, defendant suffered from schizophrenia and methamphetamine addiction and faced arson charges as he had set a forest fire near a homeless encampment and a ranch while under the influence of methamphetamine. (*Pacheco*, *supra*, 75 Cal.App.5th at pp. 209–210.) About 15 units responded from several local fire departments, in addition to "two large Blackhead helicopters and a specialized airplane." (*Ibid*.) Psychologist Dr. Wood opined that, " 'as long as [the defendant] takes his psychiatric medication on a consistent basis, and stays abstinent from using methamphetamine, he would not likely pose an unreasonable risk of danger to public safety if treated in the community. However, if he does not take his antipsychotic medication as prescribed and/or returns to using methamphetamine, then he would become unstable and psychotic and be likely to reoffend in some bizarre manner.' " (*Id*. at p. 211.)

The defendant in *Pacheco* requested pretrial mental health diversion, which the trial court denied because it deemed defendant a danger to the community per section 1001.36, subdivision (b)(1)(F). (*Pacheco*, *supra*, 75 Cal.App.5th at p. 212 [the trial court took " 'judicial notice of how dangerous brush fires are and have been to this community in particular, and given these current climate conditions and the likelihood or possibility that such conduct could create a mass-casualty event is not small. And had this been a different type of offense I would probably be inclined to grant the motion' "].) The trial court concluded Pacheco posed "an unreasonable risk to public safety if treated in the community without criminal conviction and supervised probation." (*Ibid*.) On appeal, the ruling was affirmed and the trial court was found not to have abused its

21

discretion in concluding defendant was ineligible for diversion on the basis that he presented an unreasonable risk of danger (in this case, arson murder) if treated in the community. (*Id.* at pp. 213–214.)

We find respondent's reliance on this case misplaced, as *Pacheco* is distinguishable from appellant's case in multiple ways. The defendant in *Pacheco* deliberately set a forest fire near a homeless encampment and ranch, which could have created a mass casualty event as it required 15 fire-fighting units, helicopters, and a specialized airplane. This is unlike appellant who negligently fired a single shot in the air away from those nearby and then threw the gun away and turned himself into Deputy Walker with "no incident."

The expert in *Pacheco* opined that if the defendant " 'does not take his antipsychotic medication as prescribed and/or returns to using methamphetamine, then he would become unstable and psychotic and be likely to reoffend in some bizarre manner.' " (*Pacheco*, *supra*, 75 Cal.App.5th at p. 211.) Here Dr. Campbell did not go so far and proffered no such expert opinion. Instead she opined that "any risk to the community could be mitigated by treatment" and recommended a dual-diagnosis treatment plan.

Finally, in *Pacheco*, our colleagues in Division Six stated, "[m]ental health diversion may provide some motivation for remaining drug free and compliant with treatment for mental illness. In theory, felony probation with state prison 'hanging over his head,' will provide even more motivation." (*Pacheco*, *supra*, 75 Cal.App.5th at p. 214.) While we do not quarrel with this theory, it would necessarily apply in every case in which

22

diversion is under consideration and, if applied in every case, moot the statute.

Here, the trial court stated: "[W]hat I have here is a defendant who had three years in the county jail suspended. And that's designed to create a strong disincentive to commit any new crime. That does not give me great confidence." As already noted, the Legislature intended mental health diversion to be applied as broadly as possible. (*Frahs*, *supra*, 9 Cal.5th at p. 632.) We find nothing in the diversion statute suggesting the Legislature intended to give courts discretion to deny diversion simply because diversion is or may be less motivating than probation or prison. The trial court appeared to be grafting on a seventh element that defendants show they do not need to be additionally motivated. The trial court's conclusion that diversion is insufficiently motivating is simply a challenge to the underlying premise of diversion itself. The Legislature has concluded that diversion has sufficient safeguards when the defendant does not pose an unreasonable risk of danger to public safety and is otherwise eligible and suitable for diversion; courts cannot override that determination just because a grant of probation in the past has not "motivated" defendants to overcome symptoms of mental illness which contribute to violations of the law.

Finally, in determining a defendant's suitability for mental health diversion, a trial court may not rely on general sentencing objectives set forth in rule 4.410 of the California Rules of Court and must consider the primary purposes of the mental health diversion statute as set forth in section 1001.35. (*People v. Qualkinbush*, *supra*, 79 Cal.App.5th at pp. 890–892; *Bunas*, *supra*, 79 Cal.App.5th at pp. 865–866.) Here, however the trial

23

court's discussion of objectives to deter defendant from committing future offenses demonstrates it relied on general sentencing objectives set forth in rule 4.410 of the California Rules of Court instead of the primary purposes of the mental health diversion statute as set forth in section 1001.35. (*Qualkinbush,* at pp. 890–892; *Bunas*, *supra*, 79 Cal.App.5th at pp. 865–866.)  The record supports appellant's clam that the trial court failed to consider the primary purposes of mental health diversion as set forth in section 1001.35

Because there was no substantial evidence to support the trial court's finding that appellant posed an unreasonable risk of committing a super strike if treated in the community, and because the trial court imposed incorrect standards in denying diversion, we conclude the court erred in denying appellant's motion for pretrial mental health diversion.  We reverse the trial court's denial of appellant's motion, with directions to grant the motion and refer the defendant to a pretrial mental health diversion program, to "avoid the unnecessary delay occasioned by yet [another]hearing."  (*People v. Williams* (2021) 63 Cal.App.5th 990, 1005.)

## DISPOSITION

The judgment is reversed with directions to grant appellant's motion for pretrial mental health diversion.

**CERTIFIED FOR PUBLICATION**

STRATTON, P. J.

I concur:

WILEY, J.

**HARUTUNIAN, J., Concurring.**

I concur with the result, because I believe it is the result the legislature intends courts to reach under these circumstances. The statute clearly limits the discretion of courts to find in any particular case that mental health diversion creates a public safety risk. The legislature does not want courts to deny mental health diversion when there is reason to believe the defendant will commit a violent felony, unless that felony constitutes a "super strike." Our decision is compelled by the policy decision made by our elected representatives. We are duty-bound to enforce the law as written, whether or not we agree with the public safety risk the law accepts as permissible.

HARUTUNIAN, J.[*]

---

[*] Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.